**WYLER INDUSTRIAL WORKS, INC., Appellant,**

v.

**Robert GARCIA, Appellee.**

No. 08–97–00581–CV.

Court of Appeals of Texas, El Paso.

July 29, 1999.

496

**498**

David M. Driscoll, Carr, Flora, Carroll & Driscoll, P.C., El Paso, for Appellant.

Enrique Moreno, Moreno and Fry, El Paso, for Appellee.

Before Panel No. 1 LARSEN, McCLURE, and CHEW, JJ.

## *O P I N I O N*

ANN CRAWFORD McCLURE, Justice.

Wyler Industrial Works, Inc. (Wyler) appeals from a wrongful termination suit in which the jury found that it discharged Robert Garcia (Garcia) because he had filed a workers' compensation claim in good faith. For the reasons stated below, we affirm.

### SUMMARY OF THE EVIDENCE

Robert Garcia was employed as a pipefitter's helper by Wyler Industrial Works, Inc. On December 18, 1991, Garcia sustained a work-related injury and thereafter filed a claim with the Texas Workers' Compensation Commission. Garcia did not work for four months following the injury. During this time, Garcia was visited by Gene Reimer (Reimer), Wyler's General Manager. Reimer offered Garcia "light duty work" at full salary, which Garcia refused. Garcia ultimately returned to work on April 21, 1992, after being released for full duty by his physician.

On July 30, 1992, Garcia was terminated. Reimer told Garcia that he was laid off because the "budget [was] low."[1] However, less than a month after Garcia's termination, Wyler accepted an application for a pipefitter's helper and shortly thereafter, hired the employee for the same position held by Garcia. In correspondence to the Equal Employment Opportunity Commission (EEOC), Reimer stated that Garcia was terminated because he "was a helper and was not available for Saturday work."

On October 18, 1993, Garcia brought suit alleging violations of the Texas Workers' Compensation Statutes. *See* TEX.LAB.CODE ANN. § 451.001 (Vernon 1996)(*formerly* TEX.REV.CIV.STAT.ANN. art. 8307c). The jury returned its verdict in favor of Garcia, finding that he was laid off because he filed a workers' compensation claim and awarding damages totaling $60,000. Wyler filed a motion for judgment notwithstanding the verdict and a motion for new trial or remittitur. Both motions were denied and this appeal follows.

### STANDARDS OF REVIEW

Wyler presents five issues for review. We begin with a discussion of the legal and factual sufficiency standard of review, under which Issues One and Two will be addressed. We follow with a discussion of the abuse of discretion standard of review, under which Issues Three through Five will be addressed.

#### *Sufficiency Standards*

■ A "no evidence" or legal insufficiency point is a question of law which challenges the legal sufficiency of the evidence to support a particular fact-finding. There are two separate "no evidence"

---

1. Wyler contends that during the first six months of 1992, the business volume was very low, down $152,761 from the same period in 1991.

claims. When the party having the burden of proof suffers an unfavorable finding, the point of error challenging the legal sufficiency of the evidence should be that the fact or issue was established as "a matter of law." Where, as here, the party without the burden of proof suffers an unfavorable finding, the challenge on appeal is one of "no evidence to support the finding." *See Creative Manufacturing, Inc. v. Unik, Inc.,* 726 S.W.2d 207, 210 (Tex.App.—Fort Worth 1987, writ ref'd n.r.e.). The standard of review requires a determination by the appellate court as to whether, considering only the evidence and inferences that support a factual finding in favor of the party having the burden of proof in a light most favorable to such findings and disregarding all evidence and inferences to the contrary, there is any probative evidence which supports the finding. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965); *Southwest Craft Center v. Heilner,* 670 S.W.2d 651, 653 (Tex.App.—San Antonio 1984, writ ref'd n.r.e.); *Terminix International, Inc. v. Lucci,* 670 S.W.2d 657, 662 (Tex.App.—San Antonio 1984, writ ref'd n.r.e.); *Dayton Hudson Corp. v. Altus,* 715 S.W.2d 670, 672 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.). If more than a scintilla of evidence supports the finding, the "no evidence" point fails. *Tseo v. Midland American Bank,* 893 S.W.2d 23, 25 (Tex.App.—El Paso 1994, writ denied); *Hallmark v. Hand,* 885 S.W.2d 471, 474 (Tex.App.—El Paso 1994, writ denied).

"Insufficient" evidence or factual insufficiency involves a finding that is so against the great weight and preponderance of the evidence as to be manifestly wrong. When the party having the burden of proof complains of an unfavorable finding, the point of error should allege that the findings "are against the great weight and preponderance of the evidence." The "insufficient evidence" point of error is appropriate only when the party without the burden of proof on an issue complains of the court's findings. *Neily v. Aaron,* 724 S.W.2d 908, 912 (Tex.App.—Fort Worth 1987, no writ). The latter applies here.

The test for factual insufficiency points is set forth in *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951). In reviewing a point of error asserting that a finding is against the great weight and preponderance of the evidence, we must consider all of the evidence, both the evidence which tends to prove the existence of a vital fact as well as evidence which tends to disprove its existence. It is for the jury to determine the weight to be given to the testimony and to resolve any conflicts in the evidence. *Carrasco v. Goatcher,* 623 S.W.2d 769, 772 (Tex.App.—El Paso 1981, no writ). The jury's finding should be sustained if there is some probative evidence to support it and provided it is not against the great weight and preponderance of the evidence. *Id.* The parlance used by the courts of appeals is that such a finding "shocks the conscience" or that it is "manifestly unjust," limited by such phrases as "the jury's determination is usually regarded as conclusive when the evidence is conflicting," "we cannot substitute our conclusions for those of the jury," and "it is the province of the jury to pass on the weight or credibility of a witness's testimony." *See, e.g., Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 30–31 (Tex. 1994); *Beall v. Ditmore,* 867 S.W.2d 791, 795–96 (Tex.App.—El Paso 1993, writ denied). Thus, we cannot substitute our judgment for that of the fact finder even if we find a fact contrary to that found by the jury, provided the jury finding is supported by probative evidence and is not against the great weight and preponderance of the evidence. If, however, the verdict is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, the point should be sustained.

### Abuse of Discretion Standard

"A [party] who attacks the ruling of a trial court as an abuse of discretion labors under a heavy burden." *John-*

*son v. Fourth Court of Appeals,* 700 S.W.2d 916, 917 (Tex.1985)(orig.proceeding). The test for abuse of discretion is not whether, in our opinion, the facts present an appropriate case for the trial court's actions. Rather, it is a question of whether the court acted without reference to any guiding rules and principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986); *Amador v. Tan,* 855 S.W.2d 131, 133 (Tex.App.—El Paso 1993, writ denied). Stated more simply, the test is whether the act was arbitrary or unreasonable. *Downer,* 701 S.W.2d at 242 *citing Smithson v. Cessna Aircraft Co.,* 665 S.W.2d 439, 443 (Tex.1984); *Amador,* 855 S.W.2d at 133. The mere fact that a trial court may decide a matter within its discretionary authority in a different manner than an appellate judge in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Downer,* 701 S.W.2d at 242, *citing Southwestern Bell Telephone Co. v. Johnson,* 389 S.W.2d 645, 648 (Tex.1965). A mere error of judgment is not an abuse of discretion. *Loftin v. Martin,* 776 S.W.2d 145, 146 (Tex.1989).

## SUFFICIENCY OF THE EVIDENCE

### Liability Issue

In Issue One, Wyler complains that the evidence is legally and factually insufficient to support the jury's determination that Garcia was terminated because he filed a workers' compensation claim. Question No. 1 inquired, "Did WYLER INDUSTRIAL WORKS, INC. discharge or lay off ROBERT GARCIA because he filed a worker's compensation claim in good faith, or instituted or caused to be instituted, a worker's compensation claim in good faith?" The accompanying instruction read:

> There may be more than one cause for an employment decision. An employer does not discharge or discriminate against an employee for filing a worker's compensation claim in good faith, or in-

stituting or causing to be instituted a worker's compensation claim in good faith, if the employer would have discharged or laid off the employee when he did even if the employee had not filed a worker's compensation claim in good faith or instituted or caused to be instituted a worker's compensation claim in good faith.

The jury answered in the affirmative.

### Causal Connection

This Court has previously held that in a wrongful termination case, the employee has the burden of establishing a causal connection between the termination and his claim for workers' compensation benefits. *Urquidi v. Phelps Dodge Refining Corp.,* 973 S.W.2d 400 (Tex.App.—El Paso 1998, no pet.); *Investment Properties Management, Inc. v. Montes,* 821 S.W.2d 691, 694 (Tex.App.—El Paso 1991, no writ); *Paragon Hotel Corp. v. Ramirez,* 783 S.W.2d 654, 658 (Tex.App.—El Paso 1990, writ denied). We also concluded in *Montes* that the employee need not prove that the compensation claim was the sole cause of the termination; he merely has to show that it contributed to the employer's decision to terminate him. *Montes,* 821 S.W.2d at 694; *Mid–South Bottling Co. v. Cigainero,* 799 S.W.2d 385, 390 (Tex.App.—Texarkana 1990, writ denied). Agreeing that the plaintiff need not prove that his filing of a workers' compensation claim was the *sole cause* of his termination, the Supreme Court has articulated the standard of causation for anti-retaliation cases under Section 451.001 of the Labor Code: the employee's protected conduct must be such that, without it, the employer's prohibited conduct would not have occurred when it did. *Continental Coffee Products Co. v. Cazarez,* 937 S.W.2d 444, 450–51 (Tex.1996). Thus, we must determine whether there is any evidence of probative force to raise a fact issue on the question whether, but for Garcia's filing of a workers' compensation claim, Wyler would not have terminated him when it

did. *Id.* Circumstantial evidence that has been recognized as supporting a finding of unlawful discrimination includes:

- the employer's knowledge of the compensation claim by those making the decision to terminate;
- a negative attitude towards the employee's injured condition;
- failure to adhere to established company policies;
- discriminatory treatment of the injured employee in comparison to similarly situated employees; and
- providing incentives to refrain from reporting on-the-job injuries.

*Montes,* 821 S.W.2d at 694–95; *Paragon,* 783 S.W.2d at 658–59; *see America West Airlines, Inc. v. Tope,* 935 S.W.2d 908, 912–13 (Tex.App.—El Paso 1996, no writ). Further, proof that the stated reasons for discharge are false is sufficient to establish that the employee was terminated in violation of Section 451.001. *Continental Coffee,* 937 S.W.2d at 452; *see Paragon,* 783 S.W.2d at 660. We turn now to the record.

### Evidence Elicited at Trial

#### Knowledge of the Claim

Reimer, who made the decision to terminate Garcia, testified that he did not remember seeing the letter from the Texas Workers' Compensation Commission. However, when asked whether he was aware that Garcia had filed a claim, Reimer answered, "I'm sure that's correct."

#### Negative Attitude

The jury also heard testimony regarding Reimer's attitude toward Garcia. Reimer visited Garcia while he was recovering at home in order to deliver Garcia's Christmas bonus check and to offer him "light duty work."[2] Garcia told Reimer that he was not ready to return and that he could not even get out of bed. Garcia testified

that after he refused the light duty work, Reimer appeared "annoyed" and "irritated." He also stated that Reimer's attitude changed. Reimer himself related to the jury his attitude toward workers' compensation claims.

Q. Is it your testimony that the company is indifferent as to whether or not a worker had a workers' compensation history? Didn't matter to the company. Is that your testimony, sir?

A. No. That's not my testimony.

Q. It does matter to you, doesn't it, sir?

A. Yes, it matters.

Q. Because I asked you about your attitude in your deposition and I think you told me that you didn't want workers that made it a lifestyle out of filing workers' compensation claims?

A. That's correct. That was my testimony.

Q. And that you didn't want to bring people like that into your employment. That was your testimony; wasn't it, sir?

A. That is correct.

Q. And you felt that there were an awful lot of people out there that were making excessive amounts of claims and taking advantage of companies and insurers. You feel that way, don't you, sir?

A. That was what I stated in testimony.

Q. And that you didn't want Wyler Industries to be caught up in that type of situation. That's what you told me?

A. That is correct.

The record also reveals that Garcia received a pay raise after he returned to work and before he was laid off. And

---

**2.** Wyler's philosophy was that it was in the injured worker's best interest to return to

work as soon as possible.

when Reimer talked with Garcia about the layoff, he told Garcia that he would give him a good reference and that he would not contest his unemployment benefits. Lastly, Garcia acknowledged that his immediate supervisor never manifested a negative attitude toward him.

### Failure to Adhere to Policy and Falsity of the Reason for Discharge

These two factors are inextricably entwined. The layoffs at the company were purportedly predicated on the decline in business volume. Despite resignations, Reimer decided that layoffs were necessary in both the office and the field. One office worker was let go.[3] The determination of which hourly worker was to be laid off was based upon seniority, skill level, whether the employee was complying with company policy, and whether it would be difficult to replace the employee. At the time, the company had three pipefitter helpers, one of whom had already indicated he would be returning to school in the fall. The remaining two employees were Garcia and Billy Speights. Speights had been hired three days before Garcia and had demonstrated a willingness to work weekends. Speights was retained and Garcia was laid off. Although Garcia was told that another worker had also been laid off, and despite similar written representations to the EEOC, the evidence at trial indicated that such was not the case.

Thus, Reimer testified at trial that Garcia was "let go" due to lack of work. However, in correspondence with the EEOC, Reimer stated that Garcia was terminated because he "was a helper and was not available for Saturday work."[4] The boiler shop foreman was responsible for orchestrating the Saturday work crews. He recalled instances when he asked Garcia to work on a weekend and Garcia responded that he would not work weekends because he wanted to spend time with his family. Of the fourteen weekends after Garcia returned to work following his injury, he only worked two while Speights worked ten weekends during the same period of time. The problem of Garcia's weekend availability was echoed by Patrick Berry. On one occasion when Berry asked Garcia to work on a Saturday, Garcia refused. Berry decided not to write him up for it at the time, although the second time it happened, Berry prepared a writeup and discussed the situation at a weekly meeting. However, handwritten and undated memoranda in Garcia's personnel file contained some inaccuracies. For example, on one of the Saturdays that Garcia supposedly refused to work, he actually worked ten hours.

Dolores Romo (Romo), Chief Financial Officer for Wyler, testified that Garcia was the only person in the pipefitting department who had filed a workers' compensation claim. Romo also admitted that a worker had to be assigned to work on Saturdays. In other words, a helper could not decide that he wanted to work a weekend.[5] There had to be work available and someone other than the helper made the decision as to who would work on weekends.

Garcia testified that he often worked on the weekends and that he never told anyone at Wyler that he preferred not to work on Saturdays. In fact, he had worked the Saturday before his termination. Further, on the very day he was terminated, Garcia had been told he needed to work the next Saturday and he had agreed to do so. Garcia also emphasizes that refusing to work on Saturdays was a serious violation of company policy, that notwithstanding

---

3. This employee held a secretarial position which was eliminated.

4. Because of the nature of Wyler's business as an industrial repair company, weekend work is necessary and is a condition of employment.

5. Garcia testified that the reason employees liked weekend work was the fact that they received overtime pay.

this purported violation, Garcia was never warned or disciplined for refusing weekend work, and that Wyler's failure to discipline violated the company's progressive disciplinary policy.

Garcia also draws to our attention the fact that Wyler's explanation for the termination changed during the course of the litigation. In correspondence with the EEOC five weeks after the termination, Wyler said Garcia was laid off because he was not available for Saturday work. This reason was repeated in Wyler's initial answers to interrogatories. In an affidavit filed one month before trial, Reimer stated that Garcia was selected for lay off based on seniority and based on the fact that he had previously refused to work on Saturdays. The supplemental answers to interrogatories, also filed one month before trial, explained that Garcia's selection for lay off was based on seniority and that his unavailability for Saturday work was a "secondary consideration." Yet, Wyler states in its brief in this Court:

> Garcia was one of three pipefitter helpers. He and Billie Speights has [sic] been hired almost on the same date, *so there was no issue of seniority.* Of the three pipefitter helpers, Oscar Valdez, had the least seniority, but had announced that he was leaving so there was no need to lay him off. *The determination of who to lay off was made based on their willingness to work weekends.* Garcia had expressed his reluctance to work on Saturdays which was required of all employees. Billie Speights, on the other hand, had worked 10 out of 14 Saturdays after Mr. Garcia came back to work. [Emphasis added].

Lastly, less than a month after Garcia was terminated, Wyler accepted an application for another pipefitter's helper and within a week of the application, Garcia's position was filled.

*Disparity of Treatment*

Of the three pipefitter's helpers, Garcia was the only worker selected for lay off and happened to be the only individual who had filed a workers' compensation claim. Garcia urges that we infer discrimination from the fact that if, following his return to work, he worked fewer weekends than other employees, it was because the weekend schedule was a decision made by management. Implicit in this argument is the idea that Garcia was being set up or targeted for termination. While before his injury, Garcia was the only pipefitter's helper who was assigned his own company vehicle, following his return to work and for reasons that were never explained to him, Garcia was never reassigned his own truck.[6] And although Wyler contended that the layoff was based on its financial condition, the record reflects that another worker in the same position as Garcia received a pay raise following Garcia's termination.

After hearing all of the testimony and weighing the credibility of the witnesses, the jury determined that Wyler terminated Garcia because he filed a workers' compensation claim in good faith. We cannot substitute our conclusions for those of the jury and we cannot interfere with the jury's resolution of conflicts in the evidence or pass on the weight or credibility of the witnesses' testimony. While there was certainly evidence to support Wyler's claim that the company was suffering from an economic downturn, there was also evidence to support Garcia's contention that "but for" the filing of his workers' compensation claim, he would not have been terminated. We conclude that there is both legally and factually sufficient evidence to support the jury's finding that Garcia was terminated because he filed a workers' compensation claim. Accordingly, Issue One is overruled.

**6.** The injury giving rise to Garcia's workers' compensation claim resulted from a serious traffic accident in which his assigned truck was totaled. The record does not reflect whether Wyler replaced the vehicle.

### Damages Issue

■ Question No. 2 read as follows:

What sum of money, if any, if now paid in cash, would fairly and reasonably compensate ROBERT GARCIA for his damages, if any, that resulted from such conduct?

Consider the elements of damages listed below and none other. Consider each element separately. Do not include damages for one element in any other element. Do not include interest on any amount of damages you may find.

Reduce lost wages, if any, by wages earned, if any, in the past.

Answer in dollars and cents, if any, or 'None' if you answered 'Yes' to Question 1.

a) Lost earnings and employee benefits in the past (between the date of discharge or layoff and today).

b) Compensatory damages in the past which may include emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary losses.

The jury answered "$60,000" to this question. In its second issue for review, Wyler argues that there was legally and factually insufficient evidence to support this damage award. It suggests that because the trial court did not segregate the damage elements, it is impossible to ascertain what amounts the jury awarded for lost income and what amounts they awarded for mental anguish.

### Preservation of Error

■ Prior to addressing the merits of this contention, we turn to Garcia's argument that Wyler has failed to preserve error on the legal sufficiency complaint. We agree.

In *Aero Energy, Inc. v. Circle C Drilling Company*, 699 S.W.2d 821 (Tex.1985), the Supreme Court determined that as a prerequisite to a no evidence point of error on appeal, the appellant must have presented the no evidence point to the trial court by motion for instructed verdict, objection to the submission of the special issue, motion for judgment *non obstante veredicto*, motion to disregard the contested jury findings, or motion for new trial. The issue was raised again in *Salinas v. Fort Worth Cab & Baggage Co., Inc.*, 725 S.W.2d 701 (Tex.1987). Mrs. Salinas was sexually assaulted by one of the defendant's cab drivers and was awarded judgment of $2,000,000 in actual damages and $500,000 in punitive damages because the cab company had failed to exercise a high degree of care and was grossly negligent in allowing the driver to operate one of its cabs. In its application for writ of error, the cab company complained that there was no evidence of impairment of the familial relationships and no evidence of negligence or violation of a duty to the plaintiff. The Court relied upon its holding in *Aero Energy* and noted that the cab company had not presented the issue to the trial court in any of the methods enumerated therein. While it had objected to the submission of the special issue on other grounds, it had not specifically objected on a no evidence ground and the error was waived.

After *Aero* and *Salinas*, motions for new trial were required in the specified instances contained in TEX.R.CIV.P. 324(b),[7] and in

- a complaint of factual insufficiency of the evidence to support a jury finding;
- a complaint that a jury finding is against the over-whelming weight of the evidence;
- a complaint of inadequacy or excessiveness of the damages found by the jury; or
- a complaint of incurable jury argument if not otherwise ruled on by the trial court.

---

**7.** TEX.R.CIV.P. 324(a) provides that a motion for new trial is not required in either a jury or nonjury case except as provided in subsection (b). Subsection (b) provides that a motion for new trial is required as a prerequisite to the following complaints on appeal:

- a complaint on which evidence must be heard such as one of jury misconduct or newly discovered evidence or failure to set aside a judgment by default;

all other instances if the specific complaint or objection had not previously been called to the trial court's attention by some other means. This generally recognized theory was rebuked in *Wilson v. Dunn*, 800 S.W.2d 833 (Tex.1990), which involved a default judgment. The defendant timely filed a motion for new trial, which did not complain of any defects in service of citation. On appeal, the defendant/appellant raised those complaints and the plaintiff/appellee argued that error had been waived because the issue of defective service had not been raised in the trial court. In holding that error had been preserved, the Court noted by way of footnote:

> Rule 324 states that no complaints other than those specified in the rule need be raised in a motion for new trial as a prerequisite to appeal. The rule was amended in 1978 and 1981 to limit the use of motions for new trial to preserve error. However, Texas Rule of Appellate Procedure 52(a) provides that a complaint is not preserved for appellate review unless it is presented to the trial court and a ruling obtained. This rule serves the salient purpose of requiring that all complaints to be urged on appeal first be presented to the trial court so that any error can be corrected without appeal, if possible. How Rule 52(a) applies to complaints which cannot be raised prior to judgment but are not specifically required by Rule 324 to be raised in a motion for new trial, is unclear. On the one hand, if Rule 52(a) required that such complaints be raised by some means tantamount to a motion for new trial but simply not called by that name, then Rule 324 would be deceptive and its policy impaired. On the other hand, if Rule 52(a) does not apply to such complaints, then its language is overly broad and its policy undermined. These problems should be considered in future amendments to the rules.

*Wilson*, 800 S.W.2d at 837–38 n. 9. Logically, the hearing giving rise to the default judgment in *Wilson* was a bench trial. The ruling is interesting in light of a prior Supreme Court decision which is unmentioned in *Wilson* and which offered an intelligent means to harmonize the requirements of the rules of civil procedure and the rules of appellate procedure. In *Luna v. Southern Pacific Transportation Company*, 724 S.W.2d 383 (Tex.1987), the respondent urged cross-points on the apportionment of damages. The Court concluded that these points had been waived because they had not been referenced in the motion for new trial. Southern Pacific contended that Rule 324 obviated the necessity of a complaint on this issue in a motion for new trial. The Court stated:

> We disagree. '[T]he purpose of the amendment is to make more liberal the prerequisites of appeal *once a point of error has been preserved ...*' *Western Constr. Co. v. Valero Transmission Co.*, 655 S.W.2d 251, 256 (Tex.App.—Corpus Christi 1983, no writ). Southern Pacific did not otherwise preserve error. Therefore, a motion for new trial incorporating the apportionment complaint was required. [Emphasis in original.]

*Luna*, 724 S.W.2d at 384. At roughly the same time as the *Wilson* opinion issued, former TEX.R.APP.P. 52(d) was amended to provide that "[a] party desiring to complain on appeal in a nonjury case that the evidence was legally or factually insufficient to support a finding of fact ... shall not be required to comply with paragraph (a) of this rule." As a result of the 1997 amendments to the Texas Rules of Appellate Procedure, this rule has now been deleted. We are left then with TEX. R.CIV.P. 324, which has already been set forth, and TEX.R.APP.P. 33.1, which provides:

> (a) *In General.* As a prerequisite to presenting a complaint for appellate review, the record must show that:
>
> > (1) the complaint was made to the trial court by a timely request, objection, or motion that:
> >
> > > (A) stated the grounds for the ruling ... and

(B) complied with the requirements of the Texas Rules of Civil or Criminal Evidence or the Texas Rules of Civil or Appellate Procedure....

Subsection (B) was designed to eliminate conflict between the Rules of Civil Procedure and the Rules of Appellate Procedure. If a litigant complied with other rules for preservation of error, the issue could be raised on appeal. Regardless of the intent behind the rule amendment, it appears that the new rule requires that the objection comply with the appropriate rules, i.e., Tex.R.Civ.P. 324, **AND** that it have been presented to the trial court, even if the applicable rule does not require presentation.[8]

■ Here, Wyler urged an oral motion for instructed verdict complaining only that there was no causal connection between the filing of the workers' compensation claim and Garcia's termination. Because there was some evidence at least as to lost wages, an instructed verdict on that issue would have been pointless.[9] Next, Wyler objected to the charge, but once again, quite properly, not on the issue of damages.[10] However, following the jury's verdict, Wyler filed a motion for *judgment non obstante veredicto* which urged only a legal sufficiency complaint as to Question 1, the liability issue. There was no allegation addressing the sufficiency of the evidence as to damages. Finally, in its motion for new trial, Wyler complained of the legal and factual insufficiency of the evidence as to the liability issue, but urged only a factual sufficiency complaint as to damages. We conclude that only a factual sufficiency complaint is preserved.

### Lost Earnings

The record reflects that at the time of his layoff, Garcia was earning $6 per hour. He was unemployed for a period of three months, resulting in lost earnings of $2,880. ($6 per hour X 40 hours per week X 4 weeks per month X 3 months). He then began working for a different company at the rate of $5.50 per hour, where he remained for approximately fifteen months. Thereafter, Garcia received hourly pay in excess of what he earned at the time of his termination. The income differential during this period of time totals $1,200. ($.50 per hour X 40 hours per week X 4 weeks per month X 15 months). Accordingly, the aggregated lost wages slightly exceed $4,000. Wyler does not contest these figures; instead, it focuses on the mental anguish damages.

### Mental Anguish Damages

■ Mental anguish damages cannot be awarded without either "direct evidence of the nature, duration, and severity of [plaintiffs'] mental anguish, thus establishing a substantial disruption in the plaintiffs' daily routine," or other evidence of " 'a high degree of mental pain and distress' that is 'more than mere worry, anxiety, vexation, embarrassment, or anger.' " *Parkway Co. v. Woodruff,* 901 S.W.2d 434, 444 (Tex.1995). Compensable mental anguish includes a mental sensation of pain resulting from "such painful emotions as grief, severe disappointment, indignation, wounded pride, shame, despair or public humiliation or a. combination of any of these." *Wal–Mart Stores, Inc. v. Odem,* 929 S.W.2d 513, 528 (Tex. App.—San Antonio 1996, writ denied). Not only must there be evidence of the

---

8. We urge the Supreme Court to consider a clarification of the rule in subsequent amendments.

9. An instructed verdict is proper only in response to a legal sufficiency, or no evidence, complaint. If there is some evidence presented, the trial court cannot direct a verdict. *Mills v. Angel,* 995 S.W.2d 262, —— (Tex. App.—Texarkana 1999, n.p.h.); *Brookshire*

*Brothers, Inc. v. Wagnon,* 979 S.W.2d 343, 350 (Tex.App.—Tyler 1998, pet. filed).

10. Similarly, if there is some evidence presented, the trial court errs in failing to submit the issue. *Cash America International, Inc. v. Hampton Place, Inc.,* 955 S.W.2d 459, 462 (Tex.App.—Fort Worth 1997, pet. denied).

existence of compensable mental anguish, there must also be some evidence to justify the amount awarded. *Saenz v. Fidelity & Guaranty Insurance Underwriters*, 925 S.W.2d 607, 614 (Tex.1996). While the impossibility of any exact evaluation of mental anguish requires that juries be given a measure of discretion in finding damages, that discretion is limited. *Burlington Coat Factory Warehouse of El Paso, Inc. v. Flores*, 951 S.W.2d 542, 548 (Tex. App.—El Paso 1997, no writ). Juries cannot simply pick a number and put it in the blank. *Id.* at 548. They must find an amount that, in the standard language of the jury charge, " 'would fairly and reasonably compensate' for the loss." *Id.citing Saenz*, 925 S.W.2d at 614. "Compensation can only be for mental anguish that causes 'substantial disruption in ... daily routine' or 'a high degree of mental pain and distress.' " *Id.citing Parkway*, 901 S.W.2d at 444.

The Supreme Court has recently revisited the issue in a legal malpractice case. In *Latham v. Castillo*, 972 S.W.2d 66 (Tex. 1998), the Castillos sued their attorney who had failed to timely file a medical malpractice action arising from the death of their twin daughters, alleging a violation of the Deceptive Trade Practices Act (DTPA), breach of contract, fraudulent misrepresentation, and negligence. The trial court granted a directed verdict for Latham that the Castillos take nothing. The court of appeals reversed and remanded in part, concluding that the Castillos had presented some evidence to prevent a directed verdict on their DTPA claim, remanded without comment the breach of contract and fraudulent misrepresentation claims, and affirmed the directed verdict on the negligence claim. The Supreme Court affirmed the remand of the DTPA claim and reversed and rendered that the Castillos take nothing on the remaining claims. *Id.* at 67. After concluding that Latham's misrepresentation to the Castillos—that he had filed and was actively prosecuting the medical malpractice suit—constituted unconscionable conduct, the court addressed whether the Castillos' mental anguish damages constituted actual damages under the Act and whether Latham's conduct was the producing cause of those damages. The Court concluded that the Castillos had satisfied their burden on the damages element of a DTPA cause of action if they had presented "some evidence" of mental anguish. *Id.* at 69. In reviewing the evidence, the Court compared its recent opinions:

> The plaintiffs in *Parkway* alleged that they were 'hot,' 'very disturbed,' 'not pleased,' and 'upset.' *Id.* at 445. We held that these allegations were 'mere emotions' that did not rise to a compensable level. *Id.; see also Saenz v. Fidelity & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex.1996)(holding that plaintiff's allegations that she 'worried ... a lot' did not rise to a compensable level under *Parkway* ); *Republic Ins. Co. v. Stoker*, 903 S.W.2d 338, 342 (Tex.1995)(Spector, J., concurring)(stating that plaintiff's allegations that she was 'very upset' by the offending conduct did not rise to the level of any evidence of compensable mental anguish required under *Parkway* ). In each of these cases, the plaintiffs' evidence of mental anguish amounted to 'mere emotions.' The mental anguish testimony in this record, however, exceeds that in *Parkway, Saenz,* and *Stoker.*

*Id.* at 70. The Court then recounted the testimony of Mr. Castillo concerning his reaction when Latham told him he had filed the medical malpractice suit when, in fact, he had not:

A. Well, it made me throw up.

Q. Made you sick?

A. Sick, nervous, mad.

Q. Tell the jury how you felt about that, what it did to you.

A. It just—it just hurt me a lot because I trusted in him and I—and if I had known, I would have looked for more lawyers. And he promised me he was going [to] do it, and I

trusted him to do it. Because of what they had done to my daughters, I would have never stopped; what the doctors done, I would have never stopped.

Similarly, Mrs. Castillo testified that "I—my heart was broken. I was devastated, I felt physically ill." [11] The Court then concluded that "there is some evidence that Latham's conduct caused the Castillos a 'high degree of mental pain and distress' that a jury could consider." *Id.*

With a view toward the standard enunciated by the Supreme Court, we turn now to Garcia's testimony.

Q. Mr. Garcia, I want you to look at this Jury and tell them how you felt when you lost your job?

A. I felt humiliated. I felt like—you know, I always wanted to be an employee of Wyler because that was my object to be there a long time and be with the company that I so much desired to work for. And, you know, all my dreams went down, you know, that they would lay me off just like that when I knew there was work. And I knew I was a good worker. And I just wanted to be a hundred percent so I could work. And I knew there was work because I was working. But I felt, like, humiliated and, I mean, it's like I was crying inside.

. . . [12]

A. Yes. Well, like I said, I just felt I had been lied to and I felt like I had lost something that I had so much worked for, to be a member of Wyler, Incorporated, you know. And I just felt like I had been humiliated. I mean, it's a feeling that, you know, I can't really describe, you know.

You know, it was sad for me. It was sad for me.

Q. How long were you unemployed Mr. Garcia?

A. Approximately three months.

Q. Would you describe, for the benefit of the ladies and gentlemen of the Jury, in that three-month—approximate three-month time period how you felt, physically.

A. Physically I felt—like I say, I felt humiliated and I just, you know, I lost self-esteem, you know. I didn't sleep that good and I was having marital problems with my wife, and I was grouchy with my kids. And I just felt like, you know, feeling that I was empty. I felt empty. I really felt empty, you know.

Q. You said it affected your family?

A. Yes. We, me and my wife, had little problems, you know, and I was getting grouchy. And, you know, I pay child support and my ex-wife was, you know, coming down pretty hard. So—

Q. Did you have problems financially?

A. Well, yes.

Q. Can you describe what some of those are?

A. Couldn't pay the rent. And I couldn't give my kids what they wanted. I couldn't pay no child support. I felt, you know, like doing nothing, just sleeping all day. But other than that, I couldn't help my wife with the bills, you know, stuff like that. Stuff that, you know, a man usually does to help out the family.

On cross-examination, Garcia acknowledged that he had not visited with a psychiatrist, psychologist, family counselor, or any other doctor concerning the mental anguish he was suffering. He further ad-

11. These excerpts of testimony constitute the full range of evidence referenced by the Court.

12. The proceedings were interrupted by a courthouse evacuation alarm. Mr. Garcia continued his testimony when the trial reconvened.

mitted that the mental anguish lasted only until he secured employment and that he had no financial concerns or employment uncertainties after that. At the request of Wyler's counsel, Garcia told the jury that he believed he was entitled to $200,000 for the mental anguish he had suffered. In reviewing the evidence, we pay particular attention to the *Parkway* requirement that there be evidence of the nature, duration, and severity of the mental anguish. As to the nature of Garcia's distress, we have previously determined that evidence of marital discord, even if brief in nature, can be sufficient to show a substantial disruption in daily routine over and above mere worry, anxiety, vexation, embarrassment, or anger. *Burlington Coat Factory Warehouse of El Paso, Inc.*, 951 S.W.2d at 548. The evidence here reveals a relatively short-term duration of approximately three months. However, an award for mental anguish, even if it only existed during a four-month period of unemployment, is not unreasonable. *Id.* In considering the severity of the mental anguish, we note that Garcia testified to a loss of self-esteem, a heightened sense of humiliation, sleep disorders running the gamut from not sleeping well to "sleeping all day." Even some five years after the termination, Garcia continued to get a knot in his stomach whenever he saw a Wyler truck because of the way they treated him. Financial concerns were troubling, and Garcia mentioned his inability to pay his child support and his former wife's attempts to "come down pretty hard." While Garcia's inability to pay rent or help his wife with the bills would be cause for some concern, nonpayment of child support would generate far greater distress inasmuch as it is punishable by contempt and carries the potential of incarceration. Lastly, there was some evidence designed to quantify the damages, although the jury returned a verdict in a far lesser amount than that which Garcia requested.

We conclude that the compensatory damages were not against the great weight of the evidence. Accordingly, Issue Two is overruled.

## PREJUDGMENT INTEREST

In Issue Three, Wyler argues that the court abused its discretion in awarding prejudgment interest of ten percent compounded annually from February 8, 1993, which is the 180th day after the date Wyler received written notice of a claim and ending on the date preceding the date the judgment is rendered. Wyler contends the trial court erred because (1) there is no evidence in the record of any request being sent; (2) the prejudgment interest should not have been compounded annually; and (3) the prejudgment interest should be reduced because of delays caused by Garcia. The first two grounds have been waived inasmuch as Wyler never urged these complaints in the trial court. TEX.R.APP.P. 33.1(a). Only the third ground was preserved via Wyler's motion for new trial.

An order of dismissal was entered on December 30, 1996 due to Garcia's lack of diligence in prosecuting the case.[13] The case was then reinstated by order dated February 27, 1997. In its motion for new trial, Wyler argued that prejudgment interest should run from the date of reinstatement. In that event, Garcia would only be entitled to seven months of interest.

Prejudgment interest is "compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment." *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528 (Tex.1998), *citing Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 552 (Tex.1985). The two legal sources for

---

**13.** The order of dismissal notes that the lack of diligence occurred prior to the substitution of Garcia's current counsel.

prejudgment interest are general principles of equity and an enabling statute. *Id.* In *Cavnar*, the Supreme Court adopted a rule permitting recovery of prejudgment interest on personal injury, wrongful death and survival actions, the interest to be compounded daily. *Cavnar*, 696 S.W.2d at 554. Two years after *Cavnar* issued, the Legislature added Section 6 to Tex.Rev. Civ.Stat. art. 5069–1.05. Section 6 codified and modified the *Cavnar* rule by mandating the inclusion of prejudgment interest on judgments in wrongful death, personal injury, and property damage cases. *Johnson & Higgins*, 962 S.W.2d at 529. The statute shortened the time frame for the accumulation of prejudgment interest [14] and provided that the interest would be computed as simple interest. *Id.* One other modification is applicable here. The statute permits tolling accrual of prejudgment interest during periods of delay caused by the plaintiff or the defendant. To the extent section 6 does not apply, any award of prejudgment interest is governed by the common law.[15] Here, however, section 6 applies inasmuch as mental anguish is considered a personal injury under Texas law. *City of Alamo v. Casas*, 960 S.W.2d 240, 259 (Tex.App.—Corpus Christi 1997, writ denied).

▆▆ The award of prejudgment interest is generally discretionary with the trial court. *Lege v. Jones*, 919 S.W.2d 870, 875–76 (Tex.App.—Houston [14th Dist.] 1996, no writ); *Southwest Airlines Co. v. Jaeger*, 867 S.W.2d 824, 837 (Tex.App.—El Paso 1993, writ denied). The trial court's decision in refusing to offset from its interest calculations periods of delay caused by a litigant are reviewed under the abuse of

discretion standard. Because the offset is discretionary rather than mandatory, the reviewing court should not substitute its opinion for that of the trial court. *See City of Alamo*, 960 S.W.2d at 260 (where the appellate court affirmed the trial court's denial of offset despite the case having been twice dismissed for want of prosecution as a result of the plaintiff's inaction). We conclude that the trial court did not abuse its discretion and overrule Issue Three.

## LIABILITY INSTRUCTION

▆▆ In Issue Four, Wyler contends the court erred in submitting the instruction on liability. We review the court's charge under an abuse of discretion standard. *Texas Dep't of Human Services v. E.B.*, 802 S.W.2d 647, 649 (Tex.1990). The trial court's failure to submit a requested instruction will constitute reversible error if the failure probably caused the rendition of an improper judgment. Tex.R.App.P. 44.1(a)(1); *see Sanchez v. King*, 932 S.W.2d 177, 182 (Tex.App.—El Paso 1996, no writ). Rule 273 provides that either party may present to the court and request written questions, definitions, and instructions to be given to the jury, and the court may give them or a part thereof, or may refuse to give them, as may be proper. Tex.R.Civ.P. 273. The court shall submit such instructions and definitions as shall be proper to enable the jury to render a verdict. Tex.R.Civ.P. 277. Furthermore, the court shall submit the questions, instructions, and definitions that are raised by the written pleadings and the evidence. Tex.R.Civ.P. 278; *see Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex.1992). An instruc-

**14.** Section 6 provides that prejudgment interest generally begins to accrue on the earlier of (1) 180 days after the date the defendant receives written notice of a claim, or (2) the day the lawsuit is filed. Tex.Rev.Civ.Stat. art. 5069–1.05, § 6(a).

**15.** The Supreme Court has recently determined that under the common law, prejudgment interest begins to accrue on the earlier of (1) 180 days after the date a defendant

receives written notice of a claim or (2) the date the lawsuit is filed, accrues at the rate for postjudgment interest, and is to be computed as simple interest. *Johnson & Higgins*, 962 S.W.2d at 531–32. The holding was expressly applied to all cases in which judgment was rendered on or after December 11, 1997 and to all other cases in the judicial pipeline in which the issue was preserved. *Id.* at 533.

tion is proper only if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence. *McReynolds v. First Office Mgmt.,* 948 S.W.2d 342, 344 (Tex.App.—Dallas 1997, no writ). The trial court has considerable discretion in submitting explanatory instructions and definitions to enable the jury to render a verdict. *Mobil Chemical Co. v. Bell,* 517 S.W.2d 245, 256 (Tex.1974).

The question and the accompanying instruction were submitted by the trial court according to the recommendation in the Pattern Jury Charges. *See* STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES—BUSINESS CONSUMER & EMPLOYMENT PJC 107.5 (1997). The question and instruction are in substantially correct form and are supported by the evidence. Finding the submission to be neither arbitrary nor unreasonable, we conclude the trial court did not abuse its discretion. Issue Four is overruled.

### EVIDENTIARY COMPLAINT

 In Issue Five, Wyler claims the court erred in excluding evidence of the amounts received by Garcia from workers' compensation and from unemployment compensation. The admission and exclusion of evidence is a matter within the discretion of the trial court. *Gee v. Liberty Mutual Fire Insurance Co.,* 765 S.W.2d 394, 396 (Tex.1989). The collateral source rule prevents introduction of evidence relating to benefits received by an employee in a worker's compensation retaliation case. *Azar Nut Co. v. Caille,* 720 S.W.2d 685, 688 (Tex.App.—El Paso 1986), *citing McLemore v. Broussard,* 670 S.W.2d 301 (Tex.App.—Houston [1st Dist.] 1983, no writ), *aff'd,* 734 S.W.2d 667 (Tex. 1987); *Texas General Indemnity Co. v. Hamilton,* 420 S.W.2d 735 (Tex.Civ.App.—San Antonio 1967, writ ref'd n.r.e.); *Traders & General Insurance Co. v. Reed,* 376 S.W.2d 591 (Tex.Civ.App.—Corpus Christi 1964, writ ref'd n.r.e.).

 The issue of collateral source payments was the subject of a motion in limine. However, a trial court's ruling on a motion in limine does not preserve error. *Hartford Accident and Indemnity Co. v. McCardell,* 369 S.W.2d 331, 335 (Tex.1963); *Collins v. Collins,* 904 S.W.2d 792, 798 (Tex.App.—Houston [1st Dist.] 1995), *writ denied,* 923 S.W.2d 569 (Tex.1996). To preserve error concerning the exclusion of evidence, the complaining party must actually offer the evidence and secure an adverse ruling from the court. *Johnson v. Garza,* 884 S.W.2d 831, 834 (Tex.App.—Austin 1994, writ denied). While the reviewing court may be able to discern from the record the nature of the evidence and the propriety of the trial court's ruling, without an offer of proof, we can never determine whether exclusion of the evidence was harmful. Thus, when evidence is excluded by the trial court, the proponent of the evidence must preserve the evidence in the record in order to complain of the exclusion on appeal. *Weng Enterprises, Inc. v. Embassy World Travel, Inc.,* 837 S.W.2d 217, 221 (Tex.App.—Houston [1st Dist.] 1992, no writ); *see* TEX.R.EVID. 103. Compliance with the evidentiary rules on an offer of proof preserves error for appellate review. TEX.R.APP.P. 33.1(a)(1)(B). The reason for the offer of proof is explained in *Anderson v. Higdon,* 695 S.W.2d 320 (Tex.App.—Waco 1985, writ ref'd n.r.e.):

> When tendered evidence is excluded, whether testimony of one's own witness on direct examination or testimony of the opponent's witness on cross-examination, in order to later complain it is necessary for the complainant to make an offer of proof on a bill of exception to show what the witness' [sic] testimony would have been. Otherwise, there is nothing before the appellate court to show reversible error in the trial court's ruling.

*Id.* at 325.

 The issue of collateral source income was discussed outside the presence of the jury on several occasions during the

trial. Wyler's counsel argued that the evidence of collateral source income should be admitted for the purposes of impeaching Garcia regarding his inability to pay bills and provide for his family. Even if we were to agree that exclusion of the evidence was error, we cannot determine whether the error was harmful. Wyler has failed to demonstrate that the judgment turned on the particular evidence excluded or to otherwise direct us to any harm suffered from the exclusion. By failing to offer the excluded evidence, nothing has been preserved for review. Accordingly, we overrule Issue Five. *See* TEX. R.APP.P. 33.1.

Having overruled the five issues presented for review, we affirm the judgment.